WILLIAM R. HARRIS *v.* H. ROBERT JONES ET AL.

[No. 58, September Term, 1977.]

*Decided December 9, 1977.*

The cause was argued before MURPHY, C. J., and SMITH, LEVINE, ELDRIDGE and ORTH, JJ.

*Paul A. Gibbons,* with whom were *Fine & Klauber, P.A.* and *Harry Fox* on the brief, for appellant.

*Francis B. Burch, Jr.,* and *Gerard P. Uehlinger,* with whom were *Joseph G. Finnerty, Jr., Edward S. Digges, Jr.,* and *Piper & Marbury* and *Otis M. Smith,* General Counsel, General Motors Corporation, on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court.

In *Jones v. Harris,* 35 Md. App. 556, 371 A. 2d 1104 (1977), a case of first impression in Maryland, the Court of Special Appeals, in a scholarly opinion by Judge W. Albert Menchine, recognized intentional infliction of emotional distress as a new and independent tort in this jurisdiction. It found that a majority of the states now recognize intentional infliction of emotional distress as a separate and distinct basis of tort liability, apart from any other tort, thus repudiating earlier holdings that claims for emotional distress could not be sustained except as a parasitic element of damage accompanying a recognized tort. We granted certiorari to review the decision of the Court of Special Appeals and to decide whether, if intentional infliction of emotional distress is a viable tort in Maryland, the court erred in reversing judgments entered on jury verdicts for the plaintiff on that cause of action.

The plaintiff, William R. Harris, a 26-year-old, 8-year

employee of General Motors Corporation (GM), sued GM and one of its supervisory employees, H. Robert Jones, in the Superior Court of Baltimore City. The declaration alleged that Jones, aware that Harris suffered from a speech impediment which caused him to stutter, and also aware of Harris' sensitivity to his disability, and his insecurity because of it, nevertheless "maliciously and cruelly ridiculed . . . [him] thus causing tremendous nervousness, increasing the physical defect itself and further injuring the mental attitude fostered by the Plaintiff toward his problem and otherwise intentionally inflicting emotional distress." It was also alleged in the declaration that Jones' actions occurred within the course of his employment with GM and that GM ratified Jones' conduct.

The evidence at trial showed that Harris stuttered throughout his entire life. While he had little trouble with one syllable words, he had great difficulty with longer words or sentences, causing him at times to shake his head up and down when attempting to speak.

During part of 1975, Harris worked under Jones' supervision at a GM automobile assembly plant. Over a five-month period, between March and August of 1975, Jones approached Harris over 30 times at work and verbally and physically mimicked his stuttering disability. In addition, two or three times a week during this period, Jones approached Harris and told him, in a "smart manner," not to get nervous. As a result of Jones' conduct, Harris was "shaken up" and felt "like going into a hole and hide."

On June 2, 1975, Harris asked Jones for a transfer to another department; Jones refused, called Harris a "troublemaker" and chastised him for repeatedly seeking the assistance of his committeeman, a representative who handles employee grievances. On this occasion, Jones, "shaking his head up and down" to imitate Harris, mimicked his pronunciation of the word "committeeman," which Harris pronounced "mmitteeman." As a result of this incident, Harris filed an employee grievance against Jones, requesting that GM instruct Jones to properly conduct himself in the future; the grievance was marked as satisfactorily settled after GM

so instructed Jones. On another occasion during the five-month period, Harris filed a similar grievance against Jones; it too was marked as satisfactorily settled after GM again instructed Jones to properly conduct himself.

Harris had been under the care of a physician for a nervous condition for six years prior to the commencement of Jones' harassment. He admitted that many things made him nervous, including "bosses." Harris testified that Jones' conduct heightened his nervousness and his speech impediment worsened. He saw his physician on one occasion during the five-month period that Jones was mistreating him; the physician prescribed pills for his nerves.

Harris admitted that other employees at work mimicked his stuttering. Approximately 3,000 persons were employed on each of two shifts, and Harris acknowledged the presence at the plant of a lot of "tough guys," as well as profanity, name-calling and roughhousing among the employees. He said that a bad day at work caused him to become more nervous than usual. He admitted that he had problems with supervisors other than Jones, that he had been suspended or relieved from work 10 or 12 times, and that after one such dispute, he followed a supervisor home on his motorcycle, for which he was later disciplined.

Harris' wife testified that her husband was "in a shell" at the time they were married, approximately seven years prior to the trial. She said that it took her about a year to get him to associate with family and friends and that while he still had a difficult time talking, he thereafter became "calmer." Mrs. Harris testified that beginning in November of 1974, her husband became ill-tempered at home and said that he had problems at work. She said that he was drinking too much at that time, that on one occasion he threw a meat platter at her, that she was afraid of him, and that they separated for a two-week period in November of 1974. Mrs. Harris indicated that her husband's nervous condition got worse in June of 1975. She said that at a christening party held during that month Harris "got to drinking" and they argued.

On this evidence, the case was submitted to the jury after the trial court denied the defendants' motions for directed

verdicts; the jury awarded Harris $3,500 compensatory damages and $15,000 punitive damages against both Jones and GM.

In concluding that the intentional infliction of emotional distress, standing alone, may constitute a valid tort action, the Court of Special Appeals relied upon Restatement (Second) of Torts, ch. 2, Emotional Distress, § 46 (1965), which provides, in pertinent part:

"§ 46. Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

The court noted that the tort was recognized, and its boundaries defined, in W. Prosser, *Law of Torts* § 12, at 56 (4th ed. 1971), as follows:

"So far as it is possible to generalize from the cases, the rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind."

The trend in other jurisdictions toward recognition of a right to recover for severe emotional distress brought on by the intentional act of another is manifest. Indeed, 37 jurisdictions appear now to recognize the tort as a valid cause of action.[1]

---

1. Cases from 21 jurisdictions are collected in Annot., 64 A.L.R.2d 100, § 8, at 119-26. In addition, *see* Herman Saks & Sons v. Ivey, 26 Ala. App. 240, 157 So. 265 (1934); Rugg v. McCarty, 173 Colo. 170, 476 P. 2d 753 (1970); Hiers v. Cohen, 31 Conn. Supp. 305, 329 A. 2d 609 (Super. Ct. 1973); Knierim v. Izzo, 22 Ill. 2d 73, 174 N.E.2d 157 (1961); Dawson v. Associates Financial Serv. Co. of Kan., Inc., 215 Kan. 814, 529 P. 2d 104 (1974); Campos v. Oldsmobile Div., Gen. Motors Corp., 71 Mich. App. 23, 246 N.W.2d 352 (1976); Mantz v. Follingstad, 84 N. M. 473, 505 P. 2d 68 (1972); Halio v. Lurie, 15 App. Div. 2d 62, 222 N.Y.S.2d 759 (1961); Kirby v. Jules Chain Stores Corporation, 210 N. C. 808, 188 S. E. 625 (1936); Rockhill v. Pollard, 259 Or. 54, 485 P. 2d 28 (1971); Forster v. Manchester, 410 Pa. 192, 189 A. 2d 147 (1963); Turner v.

Illustrative of the cases which hold that a cause of action will lie for intentional infliction of emotional distress, unaccompanied by physical injury, is *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1974). There, the defendant was engaged in the business of investigating cases for attorneys. She deceitfully obtained the plaintiff's photograph for the purpose of permitting a criminal defense lawyer to show it to the victims in several child molesting cases in an effort to have them identify the plaintiff as the perpetrator of the offenses, even though he was in no way involved in the crimes. While the victims did not identify the plaintiff, he was nevertheless questioned by the police, called repeatedly as a witness and required to explain the circumstances under which the defendant had obtained his photograph. As a result, plaintiff suffered shock, mental depression, nervousness and great anxiety as to what people would think of him and he feared that he would be accused of molesting the boys. The court, in concluding that a cause of action had been made out, said:

"[M]ost of the courts which have been presented with the question in recent years have held that there may be a recovery against one who by his extreme and outrageous conduct intentionally or recklessly causes another severe emotional distress.

. . .

\* \* \*

"A great majority of cases allowing recovery for such a cause of action do so when the act was intentional and the wrongdoer desired [to inflict] the emotional distress or knew or should have known that it would likely result. [citations omitted]

ABC Jalousie Company of North Carolina, 251 S. C. 92, 160 S.E.2d 528 (1968); First National Bank of Jacksonville v. Bragdon, 84 S. D. 89, 167 N.W.2d 381 (1969); Medlin v. Allied Investment Company, 217 Tenn. 469, 398 S.W.2d 270 (1966); Womack v. Eldridge, 215 Va. 338, 210 S.E.2d 145 (1974); Alsteen v. Gehl, 21 Wis. 2d 349, 124 N.W.2d 312 (1963). *See also* 38 Am. Jur. 2d *Fright, Shock, and Mental Disturbance* § 17 (1968).

"In *Samms* [*v. Eccles,* 11 Utah 2d 289, 358 P.2d 344 (1961)], the Supreme Court of Utah aptly stated:

'. . . [T]he best considered view recognizes an action for severe emotional distress, though not accompanied by bodily impact or physical injury, where the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, *or,* (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.' " 210 S.E.2d at 147-148.

The court in *Womack* identified four elements which must coalesce to impose liability for intentional infliction of emotional distress:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

Essentially, these are the elements of the tort set forth in § 46 of the Restatement, *supra.* We agree that the independent tort of intentional infliction of emotional distress should be sanctioned in Maryland, and that by closely adhering to the four elements outlined in *Womack,* two problems which are inherent in recognizing a tort of this character can be minimized: (1) distinguishing the true from the false claim, and (2) distinguishing the trifling annoyance from the serious wrong. *See* Prosser, *Intentional Infliction of Mental Suffering: A New Tort,* 37 Mich. L. Rev. 874 (1939).

As to the first element of the tort, § 46 of the Restatement,

*supra,* comment i, states, and the cases generally recognize, that the defendant's conduct is intentional or reckless where he desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct; or where the defendant acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow.

Whether the conduct of a defendant has been "extreme and outrageous," so as to satisfy that element of the tort, has been a particularly troublesome question. Section 46 of the Restatement, comment d, states that "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The comment goes on to state that liability does not extend, however:

> "to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. . . ."

Comment f states that the extreme and outrageous character of the conduct "may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." The comment continues:

> "The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized . . . that major outrage is essential to the tort . . . ."

In his now classic article, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv. L. Rev. 1033 (1936),

Professor Calvert Magruder warned against imposing
liability for conduct which is not outrageous and extreme; he
observed at 1035 that "Against a large part of the frictions
and irritations and clashing of temperaments incident to
participation in a community life, a certain toughening of the
mental hide is a better protection than the law could ever be,"
and at 1053, he said:

> "there is danger of getting into the realm of the
> trivial in this matter of insulting language. No
> pressing social need requires that every abusive
> outburst be converted into a tort; upon the contrary,
> it would be unfortunate if the law closed all the
> safety valves through which irascible tempers might
> legally blow off steam."

In determining whether conduct is extreme and
outrageous, it should not be considered in a sterile setting,
detached from the surroundings in which it occurred. *Pakos
v. Clark,* 253 Or. 113, 453 P. 2d 682 (1969). The personality
of the individual to whom the misconduct is directed is also
a factor. "There is a difference between violent and vile
profanity addressed to a lady, and the same language to a
Butte miner and a United States marine." Prosser,
*Intentional Infliction of Mental Suffering: A New Tort,* 37
Mich. L. Rev. 874, 887 (1939).

Without indicating our approval or rejection, cases decided
by other courts reflect an application of these principles. For
example, in *Pakos v. Clark, supra,* the court held that the
conduct of a police officer who told the plaintiff that he was
crazy as a bedbug and would be put back in an asylum and
his children taken from him, and the conduct of another
official who puffed up his cheeks and bulged his eyes 7 or 8
times at the plaintiff, was not extreme and outrageous
conduct. In *Paris v. Division of State Compensation Ins.
Funds,* 517 P. 2d 1353 (Colo. App. 1973), a supervisor delivered
a letter of reprimand to the plaintiff, a paraplegic, which
contained the statement: "You must realize that your job was
created for you because of your handicap." The court there
affirmed the trial court's ruling that this conduct was not so

outrageous as to support an action for the intentional infliction of emotional distress. In *Medlin v. Allied Investment Company,* 217 Tenn. 469, 398 S.W.2d 270 (1966), a mortgage lender was abusive and insulting to the plaintiff homeowner in wrongfully undertaking to foreclose on the property; the court found the conduct unreasonable but not extreme and outrageous. Similarly, in *Alsteen v. Gehl,* 21 Wis. 2d 349, 124 N.W.2d 312 (1963), a home improvement contractor's conduct in dealing with the plaintiff homeowner, while abusive, insulting, and deceitful, was held not to be extreme and outrageous.

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as extreme and outrageous; where reasonable men may differ, it is for the jury to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability. Restatement, *supra,* § 46, comment h; *Alcorn v. Anbro Engineering, Inc.,* 2 Cal. 3d 493, 86 Cal. Rptr. 88, 468 P. 2d 216 (1970); *Medlin v. Allied Investment Co., supra.*

In cases where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized by the courts. *See* F. Harper & F. James, Jr., *The Law of Torts* § 9.1, at 666-67 (1956); W. Prosser, *Law of Torts* § 12, at 56 (4th ed. 1971). Thus, in *Alcorn, supra,* the court referred to comment e of the Restatement, *supra,* § 46, *i.e.,* that the extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests. In that case, the Supreme Court of California said that a plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a mere stranger. It there found an employer's conduct toward a black employee to be extreme and outrageous, and to support an action for intentional infliction of emotional distress where the employer, "standing in a position or relation of authority over plaintiff, aware of his particular susceptibility to emotional

distress, and for the purpose of causing plaintiff to suffer such distress, intentionally humiliated plaintiff, insulted his race [by calling him a 'nigger'], ignored his union status, and terminated his employment, all without just cause or provocation." (footnotes omitted) 468 P. 2d at 218-19.

The Court of Special Appeals found that Jones' conduct was intended to inflict emotional distress and was extreme and outrageous. As to the other elements of the tort, it concluded that the evidence was legally insufficient to establish either that a causal connection existed between Jones' conduct and Harris' emotional distress, or that Harris' emotional distress was severe.

While it is crystal clear that Jones' conduct was intentional, we need not decide whether it was extreme or outrageous, or causally related to the emotional distress which Harris allegedly suffered.[2] The fourth element of the tort — that the emotional distress must be severe — was not established by legally sufficient evidence justifying submission of the case to the jury.[3] That element of the tort requires the plaintiff to show that he suffered a *severely* disabling emotional response to the defendant's conduct. The severity of the emotional distress is not only relevant to the amount of recovery, but is a necessary element to any recovery. *Alsteen v. Gehl, supra.* Comment j of § 46 of the Restatement, *supra,* elaborates on this requirement:

"Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is

2. The fact that Harris may have had some pre-existing susceptibility to emotional distress does not necessarily preclude liability if it can be shown that the conduct intensified the pre-existing condition of psychological stress. *See* Alcorn v. Anbro Engineering, Inc., 2 Cal. 3d 493, 86 Cal. Rptr. 88, 468 P. 2d 216 (1970); Alsteen v. Gehl, 21 Wis. 2d 349, 124 N.W.2d 312 (1963).

3. In so concluding, we assume the truth of all evidence, and such inferences as may properly be drawn therefrom, which tend to support the plaintiff's right to recovery. Dix v. Spampinato, 278 Md. 34, 358 A. 2d 237 (1976).

only where it is extreme that the liability arises. Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. . . .

"The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge. . . .

"It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed."

The "severe emotional distress" required to support a cause of action for intentional infliction of emotional distress was discussed by the Supreme Court of Illinois in *Knierim v. Izzo*, 22 Ill. 2d 73, 174 N.E.2d 157 (1961):

". . . not . . . every emotional upset should constitute the basis of an action. Indiscriminate allowance of actions for mental anguish would encourage neurotic overreactions to trivial hurts, and the law should aim to toughen the psyche of the citizen rather than pamper it. But a line can be drawn between the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional actions wholly lacking in social utility." 174 N.E.2d at 164.

In *Fletcher v. Western National Life Ins. Co.,* 10 Cal. App. 3d 376, 397, 89 Cal. Rptr. 78 (1970), "severe emotional distress" was defined as "emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it."

Thus, in *Johnson v. Woman's Hospital,* 527 S.W.2d 133 (1975), the Court of Appeals of Tennessee found that severe emotional distress was established by evidence showing nervous shock sustained by a mother whose newly born deceased infant was displayed to her in a jar of formaldehyde. *See also Reeves v. Melton,* 518 P. 2d 57 (Okla. Ct. App. 1973). In *Swanson v. Swanson,* 121 Ill. App. 2d 182, 257 N.E.2d 194 (1970), the court held that severe emotional distress was not shown by evidence of plaintiff's nervous shock resulting from the deliberate refusal of his brother to inform him of their mother's death, or to publish her obituary.

Assuming that a causal relationship was shown between Jones' wrongful conduct and Harris' emotional distress, we find no evidence, legally sufficient for submission to the jury, that the distress was "severe" within the contemplation of the rule requiring establishment of that element of the tort. The evidence that Jones' reprehensible conduct humiliated Harris and caused him emotional distress, which was manifested by an aggravation of Harris' pre-existing nervous condition and a worsening of his speech impediment, was vague and weak at best. It was unaccompanied by any evidentiary particulars other than that Harris, during the period of Jones' harassment, saw his physician on one occasion for his nerves, for which pills were prescribed — the same treatment which Harris had been receiving from his physician for six years prior to Jones' mistreatment. The intensity and duration of Harris' emotional distress is nowhere reflected in the evidence. All that was shown was that Harris was "shaken up" by Jones' misconduct and was so humiliated that he felt "like going into a hole and hide." While Harris' nervous condition may have been exacerbated somewhat by Jones' conduct, his family problems antedated his encounter with Jones and were not shown to be attributable to Jones' actions. Just how, or to what degree, Harris' speech impediment

worsened is not revealed by the evidence. Granting the cruel and insensitive nature of Jones' conduct toward Harris, and considering the position of authority which Jones held over Harris, we conclude that the humiliation suffered was not, as a matter of law, so intense as to constitute the "severe" emotional distress required to recover for the tort of intentional infliction of emotional distress.

*Judgment affirmed; costs to be paid by appellant.*