940 F.2d 651
 139 L.R.R.M. (BNA) 2168, 7 Indiv.Empl.Rts.Cas. 1698
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Janet BARBE, Plaintiff-Appellant,
v.
The GREAT ATLANTIC & PACIFIC TEA COMPANY, INCORPORATED, W.E.
Zentgraf, Defendants-Appellees.
 No. 89-1566.
 United States Court of Appeals, Fourth Circuit.
 Argued April 5, 1991.
Decided July 26, 1991.
As Amended Aug. 26, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Paul V. Niemeyer, District Judge. (CA-88-1316-PN)
 Michael Lewis Freilich, Michael Lewis Freilich, Chartered, Towson, Md., for appellant. Peter Francis Healey, Reed, Smith, Shaw & McClay, Washington, D.C., for appellees.
 D.Md., 722 F.Supp. 1257.
 AFFIRMED.
 Before MURNAGHAN and SPROUSE, Circuit Judges, and REBECCA BEACH SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 The case presents the issue of whether an employee's defamation and intentional infliction of emotional distress claims against an employer are preempted by Sec. 301 of the Labor Management Relations Act ("LMRA"). Janet Barbe, the employee, was covered by a collective bargaining agreement. She sued her employer, the Great Atlantic and Pacific Tea Company, Inc., ("A & P") for defamation and intentional infliction of emotional distress after she received a letter from it stating that she was terminated for falsifying a company document. The district court granted summary judgment against Barbe's claims, reasoning that her claims were preempted by Sec. 301 of the LMRA. Barbe could not make out a Sec. 301 claim because she failed to exhaust her administrative remedies and failed to make a timely claim. Barbe has appealed, arguing that her common law claims are not preempted by Sec. 301.
 
 I.
 
 2
 Barbe was a bakery clerk for A & P beginning in 1984. On April 7, 1987, personnel director W.E. Zentgraf sent her the following letter in the belief that Barbe falsified a workers' compensation claim:
 
 
 3
 This is to advise you that effective March 3, 1987, you are terminated for falsification of [a] company document.
 
 
 4
 Zentgraf forwarded copies of the letter to Barbe's two supervisors as well as to the union that represented her, Local 27 of the United Food & Commercial Workers Union.
 
 
 5
 The Union had a collective bargaining agreement ("CBA") with A & P. Article IV, Section 8 of the CBA provided:
 
 
 6
 The Employer has the right to discharge or discipline any employee for good cause, including but not limited to, proven or acknowledged dishonesty, intoxication during working hours, provided however, that no employee shall be discharged or discriminated against because of membership in the Union or for Union activities.
 
 
 7
 Article 10 of the CBA provided for a mandatory arbitration and adjustment mechanism in the event of a dispute "concerning the interpretation of the provisions of th[e] Agreement."
 
 
 8
 When the Union received the copy of the termination letter that Zentgraf sent to Barbe, it acted on Barbe's behalf. A & P agreed to rescind the letter, to purge Barbe's files, and to offer her the choice of either resigning or taking a medical leave of absence rather than termination. Barbe took a six-month leave of absence, which was later extended, and sought no further administrative relief.
 
 
 9
 But Barbe did institute a suit against A & P in Maryland state court, alleging defamation and intentional infliction of emotional distress. The suit was removed to the United States District Court for the District of Maryland. The district court, Judge Paul V. Niemeyer presiding, denied Barbe's motion to remand the case to state court, holding that Barbe's state tort claims were preempted by Sec. 301 of the LMRA. He then granted the defendants' motion for summary judgment because, as her claim was a Sec. 301 claim, Barbe had failed to exhaust her administrative remedies and had failed to file suit within the requisite six-month period. Barbe v. Great Atlantic & Pacific Tea Co., 722 F.Supp. 1257, 1263 (D.Md.1989). Barbe has argued on appeal that her state tort claims are not preempted by Sec. 301 of the LMRA, urging that her claims be remanded to state court.
 
 II.
 
 10
 The analysis for determining Sec. 301 preemption has been recently articulated in McCormick v. AT & T, F.2d, No. 88-3542 (4th Cir., May 28, 1991) (en banc ). Although two of us joined the dissent to the en banc opinion in McCormick, we are now bound to follow McCormick as this circuit's law. We thus examine "whether resolution of the cause of action requires interpretation of a collective bargaining agreement." Slip op. at 6. We note, however, that if "the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for Sec. 301 pre-emption purposes." Id. at 7 (quoting Lingle v. Norge Div'n of Magic Chef, Inc., 486 U.S. 399, 409-10 (1988)).
 
 
 11
 In Maryland, to establish a prima facie case of defamation, a plaintiff must establish that (1) the defendants published a false and defamatory statement, (2) by acting with knowledge or reckless disregard as to its falsity, or by negligently failing to ascertain the truth of the defamatory statement, (3) which has caused damage to the plaintiff. See Metromedia, Inc. v. Hillman, 285 Md. 161, 171-72, 400 A.2d 1117, 1123 (1979). The district judge concluded that Barbe's defamation claim was preempted by Sec. 301. 722 F.Supp. at 1262. First, he reasoned, whether or not sending notice of Barbe's termination to the union was "publication" would depend upon whether the CBA authorized, or perhaps even anticipated, the sending of such a notice. Id. at 1261. Thus, interpretation of the CBA would be required. Second, he reasoned that the state court would have to interpret the agreement in order to determine whether the communication from the employer to the union was privileged. Id. at 1261-62.
 
 
 12
 Under Maryland law, in order to establish a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant's conduct (1) was intentional or reckless, (2) was extreme and outrageous, and (3) caused severe emotional distress. See Harris v. Jones, 281 Md. 560, 566, 380 A.2d 611, 614 (1977). The district judge concluded that the determination of whether the conduct was outrageous or extreme would depend on whether Barbe's conduct was in violation of the agreement that provided the basis for the termination. Id. at 1262. If A & P complied with the agreement, he reasoned, "Barbe would be hard-pressed to urge that the conduct was outrageous." Id. Furthermore, he reasoned, because tortious conduct may be privileged if the tortfeasor is merely insisting on his legal rights, the agreement would have to be interpreted to consider the question of privilege. Id.
 
 
 13
 We agree with the district court that the defamation claim cannot be resolved without first determining whether "publication" occurred. However, whether the employer's notice to the union of an employee's termination constituted "publication" requires an interpretation of the CBA. The district judge's analysis of the claim for intentional infliction of emotional distress parallels the McCormick opinion's analysis of a state claim for intentional infliction of emotional distress with respect to outrageous conduct. See slip op. at 11-12. Both claims, therefore, are preempted.
 
 
 14
 Accordingly, the district court's judgment is
 
 
 15
 AFFIRMED.
 
 SPROUSE, Circuit Judge, dissenting:
 
 16
 I respectfully dissent. The recognition of the Lingle principles by my brethren in the majority is, of course, correct as far as it goes, but I dissent because I think the principles have been misapplied. In my view, state law actions are preempted by Sec. 301 only if a collective bargaining agreement is meaningfully involved.[1] Here, at most, the interpretation of the labor contract between A & P and United Food Workers Local 27 could be only peripherally related to defenses to the state law claims.
 
 
 17
 The actions here which the majority holds to be preempted by Sec. 301 are unadorned "garden variety" state tort actions--defamation and intentional infliction of emotional distress. The facts of the case, of course, have not been developed in detail, but it is apparent that A & P wrongly accused Ms. Barbe of falsifying a workers' compensation claim.[2] Neither of Barbe's state law claims alleged that A & P violated any duty directly or indirectly arising from the collective bargaining agreement. To the contrary, her claims are asserted under general provisions of Maryland law. A & P has the same duty as every citizen of Maryland not to defame another and not to intentionally inflict emotional distress on another. Barbe makes no claim that these duties were incurred or the breaches occasioned by any provision of the collective bargaining agreement.
 
 I.
 
 18
 Concerning the claim of intentional infliction of emotional distress, the majority holds that whether A & P's conduct rose to the level of "extreme and outrageous" behavior depends on whether Barbe's conduct was in violation of the clause of the collective bargaining agreement that provides "the employer has the right to discharge or to discipline any employee for good cause, including but not limited to, proven or acknowledged dishonesty...." The majority adopted the district court's reasoning that a discharge justified under this contractual provision could not be extreme and outrageous; that A & P's defense, therefore, was dependent on a demonstration that it complied with the contract; and, therefore, an interpretation of the collective bargaining agreement was necessary to the resolution of the state law claim. In my view, the insistence that such a defense depends on an interpretation of that provision is essentially premised on a "good cause" argument, i.e., that a showing of "good cause" under the agreement would be a defense to the emotional distress complaint.
 
 
 19
 This exact analysis was rejected in Lingle. There, referring to the Seventh Circuit's erroneous analysis that "the just cause provision in the collective bargaining agreement may well prohibit such retaliatory discharge," the Court announced the now familiar rule that "if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for Sec. 301 pre-emption purposes." Id. at 409-10.
 
 
 20
 Lingle involved an alleged retaliatory discharge. In Lingle, the Court described the issue before it as follows: "The question presented in this case is whether an employee covered by a collective-bargaining agreement that provides her with a contractual remedy for discharge without just cause may enforce her state-law remedy for retaliatory discharge." Id. at 401. The defendant in Lingle could have stated its principal argument in the same way that A & P does here--that if a discharge was for "just cause," it could not have been retaliatory and, therefore, the resolution of the Lingle state law claim of retaliatory discharge depended upon the meaning of the collective bargaining agreement. The Court, however, found that to reach the issue of retaliatory discharge, it need not interpret the contractual meaning of "just cause," because "just cause" might have a different meaning under the state law of retaliatory discharge. Id. at 407. Importantly, the Court explained that:
 
 
 21
 The mere fact that a broad contractual protection against discriminatory--or retaliatory--discharge may provide a remedy for conduct that coincidentally violates state law does not make the existence or the contours of the state-law violation dependent upon the terms of the private contract. For even if an arbitrator should conclude that the contract does not prohibit a particular ... retaliatory discharge, that conclusion might or might not be consistent with a proper interpretation of state law.
 
 
 22
 Id. at 412-13.
 
 
 23
 That reasoning applies with equal force to the instant case. Further, even if an arbitrator concluded that the contract included an implied notice requirement or that the contract permitted such investigations into employee misconduct, it would not resolve the state-law inquiry of whether A & P's actions were extreme and outrageous under Maryland law. As the Lingle Court ruled, the existence of a private contractual remedy against the employer's wrongful conduct "does not make the existence ... of the state-law violation dependent upon the terms of the private contract." Id. at 413.
 
 II
 
 24
 Whether the defamation action is preempted presents a closer question, but on balance, I think it is not. A & P asserts that the agreement could be interpreted to require notice to the union of Barbe's discharge, thus, implicating the defense of privilege for the publication. In the first place, the contract has no explicit notice provisions for employee discipline, discharge or otherwise. A & P asserts, however, that such notice has been customary between the parties to the agreement and that its inclusion in the contract could be inferred. Regardless of that, and regardless of whether such inclusion would, under Maryland law, be considered sufficient grounds for establishing privilege, I think the implication of the collective bargaining agreement in this manner is too attenuated. This kind of "interpretation defense" obviously could be raised against any action by an employee against her employer if the employment relationship is covered by a collective bargaining agreement. However, as the Court noted in Lingle, " 'not every dispute ... tangentially involving a provision of a collective-bargaining agreement, is pre-empted by Sec. 301.' " Id. at 413 n. 12 (quoting Allis-Chalmers, 471 U.S. at 271.) I agree that we must be cognizant of the purposes underlying the doctrine of preemption. But that presents no problem in the instant dispute. The Supreme Court could not have described those purposes more clearly than it did in Lingle. It emphasized that
 
 
 25
 the subject matter of Sec. 301(a) "is peculiarly one that calls for uniform law." ... The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation. Indeed, the existence of possibly conflicting legal concepts might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes.
 
 
 26
 Lingle, 486 U.S. at 404 n. 3.
 
 
 27
 I have quoted this language in some detail because I think it is important to focus on the purposes of the Sec. 301 preemption doctrine in deciding whether A & P's defenses would implicate those concerns. I submit that they would not. Consideration by a state court of such peripheral effects of a collective bargaining agreement could not "exert disruptive influence" upon negotiations in administration of collective agreements nor impede the parties' willingness to agree to arbitration provisions. In my view, the sweep of the Supreme Court's opinion included these kinds of circumstances when it stated that " 'not every dispute ... tangentially involving a provision of a collective-bargaining agreement, is pre-empted by Sec. 301.' " Lingle, 486 U.S. at 413 n. 12 (citation omitted). The Court simply recognized again the critical constraint imposed by concern for comity and federalism in this sensitive area of federal/state law.
 
 
 28
 I, of course, recognize the importance of core preemption principles--the promotion of collective bargaining processes and uniformity in interpreting agreements resulting from them. However, in my view, overextended preemption rulings intrude into the domain of state law courts and invade the retained prerogatives of states to regulate individual conduct. Proper adherence to Lingle would avoid these dangers while concomitantly preserving the principles of preemption, for it would require that preemption follow only when a dispute is meaningfully dependent upon interpretations of collective bargaining agreements.
 
 
 29
 The majority opinion correctly notes that we are, of course, bound by our en banc opinion in McCormick. While the proposed majority and dissenting opinions in the case sub judice were retained pending the opinion in McCormick, the result in that fact-specific case does not require an alteration of my views expressed in this dissent.
 
 
 
 [1]
 The Supreme Court cases finding Sec. 301 preemption were concerned with central involvement of a collective bargaining agreement. For example, the Supreme Court explained its analysis in Allis-Chalmers as follows:
 We began by examining the collective-bargaining agreement, and determined that it provided the basis not only for the benefits, but also for the right to have payments made in a timely manner. We then analyzed the Wisconsin tort remedy, explaining that it "exists for a breach of a 'duty devolv[ed] upon the insurer by reasonable implication from the express terms of the contract,' the scope of which, crucially, is 'ascertained from a consideration of the contract itself.' "
 Lingle, 486 U.S. at 405 (citations omitted).
 
 
 [2]
 The letter A & P sent to her and to the recipients who received copies stated: "This is to advise you that effective March 31, 1987, you are terminated for falsification of [a] company document." The union representative wrote his company counterpart, stating: "The above named employee has informed me that she was terminated on April 7, 1987. We disagree with the termination and we are requesting a meeting at your earliest convenience...." The company responded one day later, stating: "Please be advised that the letter dated April 7, 1987, concerning your termination has been rescinded. Your file has been purged of any reference to the termination...."