Justice Alito,
dissenting.
Our profound national commitment to free and open debate is not a license for the vicious verbal assault that occurred in this case.
Petitioner Albert Snyder is not a public figure. He is simply a parent whose son, Marine Lance Corporal Matthew Snyder, was killed in Iraq. Mr. Snyder wanted what is surely the right of any parent who experiences such an incalculable loss: to bury his son in peace. But respondents, members of the Westboro Baptist Church, deprived Mm of that elementary right. They first issued a press release and thus turned Matthew’s funeral into a tumultuous media event. They then appeared at the church, approached as closely as they could without trespassing, and launched a malevolent verbal attack on Matthew and his family at a time of acute emotional vulnerability. As a result, Albert Snyder suffered severe and lasting emotional injury.[1] The Court now holds that the First Amendment protected respondents’ right to brutalize Mr. Snyder. I cannot agree.
I
Respondents and other members of their church have strong opinions on certain moral, religious, and political issues, and the First Amendment ensures that they have almost limitless opportunities to express their views. They may write and distribute books, articles, and other texts; they may create and disseminate video and audio recordings; they may circulate petitions; they may speak to individuals and groups in public forums and in any private venue that *464 wishes to accommodate them; they may picket peacefully in countless locations; they may appear on television and speak on the radio; they may post messages on the Internet and send out e-mails. And they may express their views in terms that are “uninhibited,” “vehement,” and “caustic.” New York Times Co. v. Sullivan, 376 U. S. 254, 270 (1964).
It does not follow, however, that they may intentionally inflict severe emotional injury on private persons at a time of intense emotional sensitivity by launching vicious verbal attacks that make no contribution to public debate. To protect against such injury, “most if not all jurisdictions” permit recovery in tort for the intentional infliction of emotional distress (or IIED). Hustler Magazine, Inc. v. Falwell, 485 U. S. 46, 53 (1988).
This is a very narrow tort with requirements that “are rigorous, and difficult to satisfy.” W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 12, p. 61 (5th ed. 1984). To recover, a plaintiff must show that the conduct at issue caused harm that was truly severe. See Figueiredo-Torres v. Nickel, 321 Md. 642, 653, 584 A. 2d 69, 75 (1991) (“[RJecovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves” (internal quotation marks omitted)); Harris v. Jones, 281 Md. 560, 571, 380 A. 2d 611, 616 (1977) (the distress must be “ ‘so severe that no reasonable man could be expected to endure it’ ” (quoting Restatement (Second) of Torts § 46, Comment j (1963-1964))).
A plaintiff must also establish that the defendant’s conduct was “ ‘so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.’ ” Harris, supra, at 567, 380 A. 2d, at 614 (quoting Restatement (Second) of Torts § 46, Comment d).
Although the elements of the IIED tort are difficult to meet, respondents long ago abandoned any effort to show *465 that those tough standards were not satisfied here. On appeal, they chose not to contest the sufficiency of the evidence. See 580 F. 3d 206, 216 (CA4 2009). They did not dispute that Mr. Snyder suffered “'wounds that are truly severe and incapable of healing themselves.’ ” Figueiredo-Torres, supra, at 653, 584 A. 2d, at 75. Nor did they dispute that their speech was “'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.’” Harris, supra, at 567, 380 A. 2d, at 614. Instead, they maintained that the First Amendment gave them a license to engage in such conduct. They are wrong.
II
It is well established that a claim for the intentional infliction of emotional distress can be satisfied by speech. Indeed, what has been described as “[t]he leading case” recognizing this tort involved speech. Prosser and Keeton, supra, §12, at 60 (citing Wilkinson v. Downton, [1897] 2 Q. B. 57); see also Restatement (Second) of Torts § 46, Illustration 1. And although this Court has not decided the question, I think it is clear that the First Amendment does not entirely preclude liability for the intentional infliction of emotional distress by means of speech.
This Court has recognized that words may “by their very utterance inflict injury” and that the First Amendment does not shield utterances that form “no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.” Chaplinsky v. New Hampshire, 315 U. S. 568, 572 (1942); see also Cantwell v. Connecticut, 310 U. S. 296, 310 (1940) (“[P]ersonal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution”). When grave injury is intentionally inflicted by *466 means of an attack like the one at issue here, the First Amendment should not interfere with recovery.
Ill
In this case, respondents brutally attacked Matthew Snyder, and this attack, which was almost certain to inflict injury, was central to respondents’ well-practiced strategy for attracting public attention.
On the morning of Matthew Snyder’s funeral, respondents could have chosen to stage their protest at countless locations. They could have picketed the United States Capitol, the White House, the Supreme Court, the Pentagon, or any of the more than 5,600 military recruiting stations in this country. They could have returned to the Maryland State House or the United States Naval Academy, where they had been the day before. They could have selected any public road where pedestrians are allowed. (There are more than 4,000,000 miles of public roads in the United States.[2]) They could have staged their protest in a public park. (There are more than 20,000 public parks in this country.[3]) They could have chosen any Catholic church where no funeral was taking place. (There are nearly 19,000 Catholic churches in the United States.[4]) But of course, a small group picketing at any of these locations would have probably gone unnoticed.
The Westboro Baptist Church, however, has devised a strategy that remedies this problem. As the Court notes, church members have protested at nearly 600 military funerals. Ante, at 448. They have also picketed the funerals of *467 police officers,[5] firefighters,[6] and the victims of natural disasters,[7] accidents,[8] and shocking crimes.[9] And in advance of these protests, they issue press releases to ensure that their protests will attract public attention.[10]
This strategy works because it is expected that respondents’ verbal assaults will wound the family and friends of the deceased and because the media is irresistibly drawn to the sight of persons who are visibly in grief. The more outrageous the funeral protest, the more publicity the Westboro Baptist Church is able to obtain. Thus, when the church recently announced its intention to picket the funeral of a 9-year-old girl killed in the shooting spree in Tucson — proclaiming that she was “better off dead”[11] — their announcement was national news,[12] and the church was able to obtain *468 free air time on the radio in exchange for canceling its protest.[13] Similarly, in 2006, the church got air time on a talk radio show in exchange for canceling its threatened protest at the funeral of five Amish girls killed by a crazed gunman.[14]
In this case, respondents implemented the Westboro Baptist Church’s publicity-seeking strategy. Their press release stated that they were going “to picket the funeral of Lance Cpl. Matthew A. Snyder” because “God Almighty killed Lance Cpl. Snyder. He died in shame, not honor — for a fag nation cursed by God .... Now in Hell — sine die.” Supp. App. in No. 08-1026 (CA4), p. 158a. This announcement guaranteed that Matthew’s funeral would be transformed into a raucous media event and began the wounding process. It is well known that anticipation may heighten the effect of a painful event.
On the day of the funeral, respondents, true to their word, displayed placards that conveyed the message promised in their press release. Signs stating “God Hates You” and “Thank God for Dead Soldiers” reiterated the message that God had caused Matthew’s death in retribution for his sins. App. to Brief for Appellants in No. 08-1026 (CA4), pp. 3787, 3788. Others, stating “You’re Going to Hell” and “Not Blessed Just Cursed,” conveyed the message that Matthew was “in Hell — sine die.” Id., at 3783.
Even if those who attended the funeral were not alerted in advance about respondents’ intentions, the meaning of these signs would not have been missed. Since respondents chose to stage their protest at Matthew Snyder’s funeral and not *469 at any of the other countless available venues, a reasonable person would have assumed that there was a connection between the messages on the placards and the deceased. Moreover, since a church funeral is an event that naturally brings to mind thoughts about the afterlife, some of respondents’ signs — e.g., “God Hates You,” “Not Blessed Just Cursed,” and “You’re Going to Hell” — would have likely been interpreted as referring to God’s judgment of the deceased.
Other signs would most naturally have been understood as suggesting — falsely—that Matthew was gay. Homosexuality was the theme of many of the signs. There were signs reading “God Hates Fags,” “Semper Fi Fags,” “Fags Doom Nations,” and “Fag Troops.” Id., at 3781-3787. Another placard depicted two men engaging in anal intercourse. A reasonable bystander seeing those signs would have likely concluded that they were meant to suggest that the deceased was a homosexual.
After the funeral, the Westboro picketers reaffirmed the meaning of their protest. They posted an online account entitled “The Burden of Marine Lance Cpl. Matthew A. Snyder. The Visit of Westboro Baptist Church to Help the Inhabitants of Maryland Connect the Dots!” Id., at 3788.[15] Belying any suggestion that they had simply made general comments about homosexuality, the Catholic Church, and the *470 United States military, the “epic” addressed the Snyder family directly:
“God blessed you, Mr. and Mrs. Snyder, with a resource and his name was Matthew. He was an arrow in your quiver! In thanks to God for the comfort the child could bring you, you had a DUTY to prepare that child to serve the LORD his GOD — PERIOD! You did JUST THE OPPOSITE — you raised him for the devil.
“Albert and Julie RIPPED that body apart and taught Matthew to defy his Creator, to divorce, and to commit adultery. They taught him how to support the largest pedophile machine in the history of the entire world, the Roman Catholic monstrosity. Every dime they gave the Roman Catholic monster they condemned their own souls. They also, in supporting satanie Catholicism, taught Matthew to be an idolater.
“Then after all that they sent him to fight for the United States of Sodom, a filthy country that is in lock step with his evil, wicked, and sinful manner of life, putting him in the cross hairs of a God that is so mad He has smoke coming from his nostrils and fire from his mouth! How dumb was that?” Id., at 3791.
In light of this evidence, it is abundantly clear that respondents, going far beyond commentary on matters of public concern, specifically attacked Matthew Snyder because (1) he was a Catholic and (2) he was a member of the United States military. Both Matthew and petitioner were private figures,[16] and this attack was not speech on a matter of public concern. While commentary on the Catholic Church or the United States military constitutes speech on matters of public concern, speech regarding Matthew Snyder's purely private conduct does not.
*471 Justice Breyer provides an apt analogy to a case in which the First Amendment would permit recovery in tort for a verbal attack:
“[S]uppose that A were physically to assault B, knowing that the assault (being newsworthy) would provide A with an opportunity to transmit to the public his views on a matter of public concern. The constitutionally protected nature of the end would not shield A’s use of unlawful, unprotected means. And in some circumstances the use of certain words as means would be similarly unprotected.” Ante, at 461 (concurring opinion).
This captures what respondents did in this case. Indeed, this is the strategy that they have routinely employed — and that they will now continue to employ — inflicting severe and lasting emotional injury on an ever growing list of innocent victims.
IV
The Court concludes that respondents’ speech was protected by the First Amendment for essentially three reasons, but none is sound.
First — and most important — the Court finds that “the overall thrust and dominant theme of [their] demonstration spoke to” broad public issues. Ante, at 454. As I have attempted to show, this portrayal is quite inaccurate; respondents’ attack on Matthew was of central importance. But in any event, I fail to see why actionable speech should be immunized simply because it is interspersed with speech that is protected. The First Amendment allows recovery for defamatory statements that are interspersed with nondefama-tory statements on matters of public concern, and there is no good reason why respondents’ attack on Matthew Snyder and his family should be treated differently.
Second, the Court suggests that respondents’ personal attack on Matthew Snyder is entitled to First Amendment protection because it was not motivated by a private grudge,
*472 see ante, at 455, but I see no basis for the strange distinction that the Court appears to draw. Respondents’ motivation— "to increase publicity for its views,” ibid. — did not transform their statements attacking the character of a private figure into statements that made a contribution to debate on matters of public concern. Nor did their publicity-seeking motivation soften the sting of their attack. And as far as culpability is concerned, one might well think that wounding statements uttered in the heat of a private feud are less, not more, blameworthy than similar statements made as part of a cold and calculated strategy to slash a stranger as a means of attracting public attention.
Third, the Court finds it significant that respondents’ protest occurred on a public street, but this fact alone should not be enough to preclude IIED liability. To be sure, statements made on a public street may be less likely to satisfy the elements of the IIED tort than statements made on private property, but there is no reason why a public street in close proximity to the scene of a funeral should be regarded as a free-fire zone in which otherwise actionable verbal attacks are shielded from liability. If the First Amendment permits the States to protect their residents from the harm inflicted by such attacks — and the Court does not hold otherwise — then the location of the tort should not be dispositive. A physical assault may occur without trespassing; it is no defense that the perpetrator had "the right to be where [he was].” See ante, at 457. And the same should be true with respect to unprotected speech. Neither classic “fighting words” nor defamatory statements are immunized when they occur in a public place, and there is no good reason to treat a verbal assault based on the conduct or character of a private figure like Matthew Snyder any differently.
One final comment about the opinion of the Court is in order. The Court suggests that the wounds inflicted by vicious verbal assaults at funerals will be prevented or at least mitigated in the future by new laws that restrict picketing *473 within a specified distance of a funeral. See ante, at 456-457. It is apparent, however, that the enactment of these laws is no substitute for the protection provided by the established IIED tort; according to the Court, the verbal attacks that severely wounded petitioner in this case complied with the new Maryland law regulating funeral picketing. See ante, at 457, n. 5. And there is absolutely nothing to suggest that Congress and the state legislatures, in enacting these laws, intended them to displace the protection provided by the well-established IIED tort.
The real significance of these new laws is not that they obviate the need for IIED protection. Rather, their enactment dramatically illustrates the fundamental point that funerals are unique events at which special protection against emotional assaults is in order. At funerals, the emotional well-being of bereaved relatives is particularly vulnerable. See National Archives and Records Admin. v. Favish, 541 U. S. 157, 168 (2004). Exploitation of a funeral for the purpose of attracting public attention “intrud[es] upon their ... grief,” ibid., and may permanently stain their memories of the final moments before a loved one is laid to rest. Allowing family members to have a few hours of peace without harassment does not undermine public debate. I would therefore hold that, in this setting, the First Amendment permits a private figure to recover for the intentional infliction of emotional distress caused by speech on a matter of private concern.
V
In reversing the District Court judgment in favor of petitioner, the Court of Appeals relied on several grounds not discussed in the opinion of this Court or in the separate opinion supporting affirmance. I now turn briefly to those issues.
First, the Court of Appeals held that the District Court erred by allowing the jury to decide whether respondents’ speech was “'directed specifically at the Snyder family.’” *474 580 F. 3d, at 221. It is not clear whether the Court of Appeals thought that this was a question for the trial judge alone or a question on which the judge had to make a preliminary ruling before sending it to the jury. In either event, however, the submission of this question to the jury was not reversible error because, as explained above, it is clear that respondents’ statements targeted the Snyders.
Second, the Court of Appeals held that the trial judge went astray in allowing the jury to decide whether respondents’ speech was so “'offensive and shocking as to not be entitled to First Amendment protection.’” Ibid. This instruction also did respondents no harm. Because their speech did not relate to a matter of public concern, it was not protected from liability by the First Amendment, and the only question for the jury was whether the elements of the IIED tort were met.
Third, the Court of Appeals appears to have concluded that the First Amendment does not permit an IIED plaintiff to recover for speech that cannot reasonably be interpreted as stating actual facts about an individual. See id., at 222. In reaching this conclusion, the Court of Appeals relied on two of our cases — Milkovich v. Lorain Journal Co., 497 U. S. 1 (1990), and Hustler, 485 U. S. 46 — but neither supports the broad proposition that the Court of Appeals adopted.
Milkovich was a defamation case, and falsity is an element of defamation. Nothing in Milkovich even hints that the First Amendment requires that this defamation element be engrafted onto the IIED tort.
Hustler did involve an IIED claim, but the plaintiff there was a public figure, and the Court did not suggest that its holding would also apply in a case involving a private figure. Nor did the Court suggest that its holding applied across the board to all types of IIED claims. Instead, the holding was limited to “publications such as the one here at issue,” namely, a caricature in a magazine. 485 U. S., at 56. Unless a caricature of a public figure can reasonably be interpreted *475 as stating facts that may be proved to be wrong, the caricature does not have the same potential to wound as a personal verbal assault on a vulnerable private figure.
Because I cannot agree either with the holding of this Court or the other grounds oh which the Court of Appeals relied, I would reverse the decision below and remand for further proceedings.[17]
VI
Respondents’ outrageous conduct caused petitioner great injury, and the Court now compounds that injury by depriving petitioner of a judgment that acknowledges the wrong he suffered.
In order to have a society in which public issues can be openly and vigorously debated, it is not necessary to allow the brutalization of innocent victims like petitioner. I therefore respectfully dissent.

 See 580 F. 3d 206, 213-214, 216 (CA4 2009).

 See Dept. of Transp., Federal Highway Administration, Highway Statistics 2008, Table HM-12M, http://www.fhwa.dot.gov/policyinformation/ statistics/2008/hml2m.cfm (all Internet materials as visited Feb. 25, 2011, and available in Clerk of Court’s case file).

 See Trust for Public Land, 2010 City Park Facts, http://www.tpl.org/ content_documents/CityParkFacts_2010.pdf.

 See United States Conference of Catholic Bishops, Catholic Information Project, http://www.usccb.0rg/comm/cip.shtml#toe4.

 See http://www.godhatesfags.com/fliers/20110124_St-Petersburg-FL-Dead-Poliee.pdf.

 See http://www.godhatesfags.com/fliers/20110120_Dead-Volunteer-Firefighter-Connecting_the_Dots-Baltimore-MD.pdf.

 See http://www.godhatesfags.eom/fliers/20110104_Newburg-and-Rolla-MO-Tornado-Connecting-the-Dots.pdf.

 See http://www.godhatesfags.com/fliers/20101218_Wiehita-KS-Two-Dead-Wiehita-Bikers.pdf.

 See http://www.godhatesfags.eom/fliers/20110129_Tampa-FL-God-Sent-Military-Mom-Shooter-to-Kill-Kids.pdf.

 See nn. 5-9, supra.

 See http://www.godhatesfags.eom/fliers/20110109_AZ-Shooter-Conneeting-the-Dots-Day-2.pdf.

 See, e. g., Stanglin, Anti-Gay Church Group Plans To Picket Tucson Funerals, USA Today, Jan. 10, 2011, http://content.usatoday.com/communities/ ondeadline/post/2011/01/anti-gay-ehureh-group-plans-to-pieket-tucston-funerals/1; Mohanani, Group To Picket 9-Year-Old Tucson Victim’s Funeral, Palm Beach Post, Jan. 11,2011, http://www.palmbeaehpost.com/news/ nation/group-to-picket-9-year-old-tucson-vietims-1177921.html; Mehta & Santa Cruz, Tucson Rallies To Protect Girl’s Family From Protesters, L. A. Times, Jan. 11, 2011, http://articles.latimes.com/2011/jan/ll/nation/ la-na-funeral-protest-20110112; Medrano, Funeral Protest: Arizona Rallies To Foil Westboro Baptist Church, Christian Science Monitor, Jan. 11, 2011, http.//www.csmonitor.com/USA/2011/0111/Funeral-protest-Arizona-rallies-to-foil-Westboro-Baptist-Church.

 See Santa Cruz & Mehta, Westboro Church Agrees Not To Take Protest to Shooting Victims’ Funerals, L. A. Times, Jan. 13, 2011, http://articles.latimes.com/2011/jan/13/nation/la-na-funeral-protest-20110113; http://www.godhatesfags.com/fliers/20110112_AZ-Shooter-Mike-Gallagher-Radio-Exchange.pdf.

 See Steinberg, Air Time Instead of Funeral Protest, N. Y. Times, Oct. 6, 2006, p. A14.

 The Court refuses to consider the epic because it was not discussed in Snyder’s petition for certiorari. Ante, at 449, n. 1. The epic, however, is not a distinct claim but a piece of evidence that the jury considered in imposing liability for the claims now before this Court. The protest and the epic are parts of a single course of conduct that the jury found to constitute intentional infliction of emotional distress. See 580 F. 3d, at 225 (“[T]he Epic cannot be divorced from the general context of the funeral protest”). The Court’s strange insistence that the epic “is not properly before us,” ante, at 449, n. 1, means that the Court has not actually made “an independent examination of the whole record,” ante, at 453 (internal quotation marks omitted). And the Court’s refusal to consider the epic contrasts sharply with its willingness to take notice of Westboro’s protest activities at other times and locations. See ante, at 455.

 See 533 F. Supp. 2d 567, 577 (Md. 2008).

 The Court affirms the decision of the Fourth Circuit with respect to petitioner’s claim of intrusion upon seclusion on a ground not addressed by the Fourth Circuit. I would not reach out to decide that issue but would instead leave it for the Fourth Circuit to decide on remand. I would likewise allow the Fourth Circuit on remand to decide whether the judgment on the claim of civil conspiracy can survive in light of the ultimate disposition of the IIED and intrusion upon seclusion claims.