PUBLISHED

# UNITED STATES COURT OF APPEALS

### FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellant,*

v.

FAIRBROOK MEDICAL CLINIC, P.A.,

*Defendant-Appellee.*

No. 09-1610

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Richard L. Voorhees, District Judge.
(5:07-cv-00094-RLV-DLH)

Argued: May 11, 2010

Decided: June 18, 2010

Before WILKINSON and DAVIS, Circuit Judges,
and C. Arlen BEAM, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Davis and Senior Judge Beam joined.

## COUNSEL

**ARGUED:** Anne Noel Occhialino, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C.,

for Appellant. Kenneth P. Carlson, Jr., CONSTANGY, BROOKS & SMITH, LLC, Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** James L. Lee, Deputy General Counsel, Lorraine C. Davis, Acting Associate General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant. Kristine M. Sims, CONSTANGY, BROOKS & SMITH, LLC, Winston-Salem, North Carolina, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

The Equal Employment Opportunity Commission brought this suit on behalf of Dr. Deborah Waechter against her former employer, Fairbrook Medical Clinic. The agency alleges that Dr. John Kessel, the sole owner of the clinic, subjected Waechter to a hostile work environment because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court held that Kessel's conduct was not sufficiently severe or pervasive to constitute a hostile work environment. What happened here, however, was not merely general crudity but a series of graphic remarks of a highly personal nature directed at a female employee by the sole owner of an establishment. After carefully considering these circumstances, we conclude that the EEOC has presented an issue of triable fact and accordingly reverse.

### I.

For purposes of summary judgment, we "view the facts and draw reasonable inferences in the light most favorable" to the non-moving party, here the EEOC. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation omitted).

### A.

Dr. Deborah Waechter graduated from medical school in 1999 and completed her residency in 2002. In December of

2002, she accepted a position as a physician at Fairbrook Medical Clinic, a family medicine practice in Hickory, North Carolina. During the time period relevant to this suit, Fairbrook employed between twenty-four and forty-two people, most of whom were women.

Dr. John Kessel is the sole owner of Fairbrook, and he served as Waechter's immediate supervisor during her entire tenure at the clinic. By Kessel's own estimation, Waechter was an excellent physician. Within a few years of working at Fairbrook, she had between three and four hundred regular patients.

Waechter alleges that Kessel sexually harassed her while she worked at Fairbrook. According to her, the incidents of harassment became so frequent and distressing that she decided to leave the clinic for other employment in early 2006. These incidents are detailed below.

The first incident occurred a few weeks after Waechter started working at Fairbook. In January of 2003, Kessel showed her an x-ray of his hip for the supposed purpose of revealing a hip abnormality that he had suffered since adolescence. In the x-ray, a shadowy image of his penis was highly visible. After describing his hip condition, Kessel pointed to the image of his penis and called it "Mr. Happy." This comment left Waechter "speechless" and uncomfortable. According to Waechter, Kessel showed this x-ray to other people in the clinic "at least 25 to 30 times," mostly around the time that he had surgery to correct the abnormality. On about five to ten of these occasions, he referred to the image of his penis as "Mr. Happy." Other employees report having seen the x-ray as well. For example, Joseph Sigmon, the former pharmacist at Fairbrook, testified that the x-ray was left hanging on a wall for four to six weeks and that Kessel showed it to female drug representatives who came to the clinic.

The next incident occurred in February of 2003. During a staff meeting, Kessel stated that he "was very glad that his

wife had had a c-section with their triplets because she still had a nice, tight pussy." Although Waechter was not present at the meeting, employees who were in attendance later reported the incident to her. On a few occasions, Kessel directly discussed his sex life with Waechter, telling her that he "was glad that [his wife] hadn't had to have a vaginal birth because her muscles were still tight." When Waechter said that she did not feel comfortable discussing the topic, Kessel said "Well, you're just like one of the guys," to which she replied "No, I'm not."

In March of 2003, Kessel approached Waechter to talk about her attire. Kessel reported that a male patient had remarked that Kessel "sure had hired a lady physician with a nice set of breasts." He then instructed Waechter to be "aware . . . of [her] breasts and dress appropriately." When Waechter asked what the patient had been referring to, Kessel responded that the patient had probably been able to see her nipples through her blouse. Waechter replied that she tried to maintain a professional appearance and did not dress in a manner that would show her nipples.

At some point, Kessel invited Waechter to look at some photographs from his recent vacation to the Caribbean. Waechter agreed, expecting to see innocuous images of beaches or scuba diving. She was shocked, however, to discover a picture of Kessel, his wife, and a few other couples in which the men were wearing Speedos and the women were topless. When Waechter expressed her surprise, Kessel called the photograph "funny" and remarked that he still could not believe that his wife had agreed to have it taken.

In the fall of 2004, Kessel was receiving physical therapy in an examination room in the vicinity of Waechter's work station. He opened the door, emerged from the room without a shirt, and called out, "Hey Deborah, don't you want to come in here?" Waechter refused and went about her business.

In March of 2005, Waechter traveled with her daughter to visit her husband in Washington, D.C., where he was doing an internship. While Waechter was gone, Kessel treated one of her regular patients. According to the patient, Kessel said that Waechter was away on vacation and was "probably screwing around so she can have another baby." At the end of the visit, he told the patient, "You can follow up with Dr. Waechter when she returns from screwing." When Waechter returned, the patient informed her of Kessel's remarks. Waechter was "absolutely infuriated" and confronted Kessel. She told him that she considered it very "inappropriate and unprofessional" to speak that way about a colleague, especially in front of a patient. Kessel adamantly denied making the remarks but did not attempt to explain why the patient would have made them up.

Waechter also recalls hearing Kessel tell "dirty jokes" about "two or three times a month" during her time at Fairbrook. Specifically, she remembers one joke in which Kessel pretended to kiss a pair of breasts, moving back and forth between each one. On one occasion, Kessel told a foul joke to a male drug representative in front of Waechter. When the drug representative said he was surprised that Kessel would tell such a joke in front of Waechter, Kessel responded, "Oh, she's just like one of the guys. I just say anything in front of her." Waechter then interjected that she did not appreciate hearing his jokes.

According to Waechter, Kessel also made demeaning comments about female drug representatives in front of her. On one such occasion, a female drug representative was walking down the hall with her back turned to Kessel. Kessel looked to Waechter and said, "Doesn't she look great for having had three kids? I sure would like a piece of that." He then gestured as if he were grabbing the representative's buttocks. Waechter protested that the comment was not "very nice." Unfazed, Kessel stated, "Well[,] she does look great for having had three kids."

Other employees similarly report that Kessel joked about sex and made demeaning comments about women. Joseph Sigmon recalls that Kessel frequently talked about "oral sex" and "women's breasts" and occasionally used terms like "slut" and "cunt" to refer to female staff and patients at the clinic. According to Sigmon, Kessel made sexually offensive remarks to "[a]nybody, anytime," whether male or female. He further stated that Kessel delighted in being a "shock jock" and watching women react to his obscene comments. In a similar vein, another employee reported that Kessel used the term "slut" to refer to his own sister.

Of course, Kessel was not the only one who made crude remarks around the clinic. Both employees and patients occasionally did so as well. Waechter herself even made off-color remarks on a few occasions. After one patient told her that her "breasts had grown," Waechter joked with the patient and later reported the episode to other employees. On another occasion, Waechter authorized her assistant to tape posters of attractive men, some of whom were bare-chested, to the ceiling above where she conducted pelvic examinations on female patients. After seeing the posters during her examination, a patient in her eighties told Waechter that she "hadn't had that much excitement in years." Waechter later joked about the incident around the office.

B.

Kessel's comments to Waechter became much more personal after she became pregnant with her second child. By October of 2005, Waechter was in her ninth month of pregnancy. On two or three occasions that month, Kessel told her "how big [her] breasts were getting and how fat [she] was getting." When Waechter complained that these comments were inappropriate, Kessel responded, "Well[,] you know I'm a breast man. I like breasts." Shortly thereafter, Waechter gave birth and went on maternity leave for six weeks.

When Waechter returned from maternity leave in December of 2005, Kessel's comments about her breasts became more frequent. On her first day back at work, for instance, Kessel spotted her arriving in the parking lot and said, "You sure have slimmed down, except in your breasts." At that time, Waechter was still nursing her child at home and would pump breast milk in her office, usually during her lunch breaks. On several occasions, Kessel asked her when "[she] was going to let him help [her] pump [her] breasts." Other times, he inquired if she "had a better sexual libido while [she] was pumping" and opined that she "was probably a wild thing in bed." He also asked her, "Are you going to let me see your breasts?" and then stated, "I sure hope you let me do so before you stop pumping." Waechter estimates that Kessel made these comments "at least once or twice per week" from her return in December of 2005 through January of 2006. By January, Waechter found Kessel's behavior "very distressing" and concluded that Fairbrook was no longer "a good working environment for [her]." Accordingly, she began to consider other employment.

Kessel's offensive behavior continued into February of 2006. One day in early February, Waechter was sitting in the break room with an employee named Debra Sharpe. Kessel entered the room and announced that he had stopped by Waechter's office to look for her. He then reported that he had seen a drop of breast milk on her desk and that he wanted to "to lick it up."[1] Appalled, Waechter told Kessel that his comments were "disgusting" and "gross." Although Kessel never repeated that remark, he continued to make comments about pumping her breasts.

The "last straw" for Waechter happened on February 13, 2006. At that time, Waechter was involved in a contract dis-

---

[1]Sharpe testified that Kessel told Waechter that the milk "needed to be cleaned up." For purposes of summary judgment, we accept Waechter's version of events.

pute with a hospital called Frye Regional Medical Center that had loaned her money in 2002 so that she could relocate to Hickory, North Carolina. Kessel was paying her legal fees in the matter and had assured Waechter that he would pay her outstanding debt if no other solution could be reached. On the day in question, Kessel approached Waechter at the clinic and said, "You owe me big for helping you with the Frye thing." He then asked, "Are you going to let me help you pump [your breasts]?" Waechter called his comments "ridiculous" and said that they "needed to stop." She explained that, while she appreciated his help with the Frye matter, she "didn't think that he needed to tell [her] that [she] owed him something, especially of a sexual nature." That was the last time that Kessel made an inappropriate comment to her.

On February 17, 2006, Waechter tendered her resignation. In a letter to Kessel, she thanked him for the opportunity to practice medicine at Fairbrook and announced that she would be taking a position at another practice. In addition, she stated her intention to continue working at Fairbrook for thirty days in order to ensure a smooth transition. Nowhere in the letter did she complain about Kessel's behavior. According to Waechter, she declined to do so primarily because she wanted to keep working at Fairbrook until her new job became available in order to provide continuous support for her family.

Waechter continued working at Fairbrook until March 17, 2006 and then started her new job the following week. Her new position had several advantages over her former one; namely, it had a higher salary and a shorter commute. Nonetheless, Waechter maintains that she would not have been as interested in the new position had it not been for Kessel's behavior. In fact, she turned down two other offers of employment prior to October of 2005, the point at which Kessel began making comments about her breasts on a regular basis.

While Waechter was working at Fairbrook, the clinic had an official policy prohibiting sexual harassment. The policy

instructs employees to report any sexual harassment to their "immediate supervisor[s]." If doing so is ineffective, employees should then report their complaints to "the partners" of Fairbrook and ultimately to "a human resource representative or a representative of the EEOC." Under the policy, Kessel was both Waechter's immediate supervisor and the only partner of Fairbrook, given that he was its sole owner. As detailed above, she complained to him about his remarks on multiple occasions. Waechter also told the officer manager, Shelia Cook, that Kessel made a comment about her breasts, and she believes she may have told the personnel manager, Sherry Bartnicki, about one of Kessel's comments as well. The clinic did not conduct an investigation or take any corrective action.

## C.

On June 27, 2006, Waechter filed a charge of sex discrimination with the EEOC.[2] The EEOC subsequently filed a suit on her behalf on August 23, 2007, alleging that Fairbrook was liable for a hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1).

After discovery, the district court granted Fairbrook's motion for summary judgment. In its view, Kessel's conduct was neither severe nor pervasive enough to constitute a hostile work environment. Specifically, it reasoned that the offensive conduct was "not particularly frequent," mostly involved "the type of crude jokes that do not run afoul of Title VII," did not cause Waechter to miss work or feel "severe psychological stress," and did not include inappropriate touching or physical threats. The EEOC now appeals.

---

[2]At that time, Waechter was still involved in the contract dispute with Frye Regional Medical Center. In September of 2006, Frye sent Waechter a letter stating its intention to sue. At some point thereafter, Waechter filed a third-party complaint against Fairbrook, seeking contribution toward the debt she owed Frye. The dispute was ultimately settled through mediation in May of 2007, with Fairbrook paying part of Waechter's debt.

## II.

Title VII of the Civil Rights Act of 1964 states that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has held that this prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Thus, "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor*, 477 U.S. at 66. To make out such a claim, a plaintiff must show that "the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

We review the district court's summary judgment ruling on the EEOC's hostile work environment claim de novo, applying the same legal standard used by the district court. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Fairbrook does not dispute that Waechter found Kessel's conduct to be unwelcome. It does contend, however, that it is entitled to judgment as a matter of law on each of the other three elements of the EEOC's hostile work environment claim. We consider each of these elements in turn.

### A.

First, Fairbrook contends that Kessel did not make offensive comments to Waechter because of her sex. Instead, it

argues that Kessel was a generally crude person who made vulgar comments to men and women alike.

This contention is easily dismissed. Although Kessel made offensive remarks in front of both male and female audiences, his use of "sex-specific and derogatory terms" indicates that he intended to demean women. *See Oncale*, 523 U.S. at 80. To provide a few examples, Kessel used terms like "cunt" and "slut" to refer to women at the clinic and talked about female body parts, including his own wife's, in graphic terms. Moreover, several of his remarks involved "explicit or implicit proposals of sexual activity," that a reasonable jury could infer "would not have been made to someone of the same sex." *Id.* For instance, Kessel asked Waechter if she had a better libido while she was pumping her breasts, opined that she was probably a "wild thing" in bed, and requested to view and pump her breasts. Based on the nature of these remarks, we think that a jury could conclude that Kessel's comments were based on sex and that their intimate nature was intended to make women in his employ feel acutely embarrassed and uncomfortable. Kessel's delight in being a "shock jock" does nothing to dispel the impression.

### B.

The main dispute in this case centers on whether Kessel's conduct was sufficiently severe or pervasive to create a hostile work environment. As the Supreme Court has emphasized, "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor*, 477 U.S. at 67. To be actionable, sexual harassment must be objectively hostile or abusive, and the victim must subjectively perceive it as such. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

In its brief, Fairbrook does not contest that Waechter subjectively perceived her work environment to be hostile or abu-

sive. We focus, therefore, on the objective prong of this inquiry, which is designed to disfavor claims based on an individual plaintiff's hyper-sensitivity. There is no "mathematically precise test" for determining if an environment is objectively hostile or abusive. *Harris*, 510 U.S. at 22. Instead, the "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 23). These circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. This inquiry also "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. Conduct which is considered normal and appropriate in one setting may be deemed abusive or hostile in another.

Fairbrook's principal argument is that Kessel's conduct, when viewed in its social context, was not severe; instead, it was merely the sort of crude behavior that is not actionable under Title VII. Specifically, it points out that the conduct occurred in a medical clinic where employees dealt with human bodies every day. In this environment, it was not uncommon for both patients and employees to tell off-color jokes to ease the tensions in otherwise awkward situations. The casual nature of this environment, Fairbrook contends, is best illustrated by the fact that Waechter herself considered it appropriate to display pictures of shirtless men in her examination room.

If this case were merely about the crude or vulgar commentary which is an unfortunate feature of some workplaces, then Fairbrook would be correct to assert that the EEOC has no claim. Title VII, after all, is not "a general civility code." *Oncale*, 523 U.S. at 81. "[W]hile no one condones boorishness, there is a line between what can justifiably be called

sexual harassment and what is merely crude behavior." *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008). Activities like simple teasing, offhand comments, and off-color jokes, while often regrettable, do not cross the line into actionable misconduct. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). If they did, courts would be embroiled in never-ending litigation and impossible attempts to eradicate the ineradicable, and employers would be encouraged "to adopt authoritarian traits" to purge their workplaces of poor taste. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008).

This case involves more than general crudity, however. Waechter's allegations, if proven, show that Kessel targeted her with highly personalized comments designed to demean and humiliate her. In some cases, the remarks seemed intended to ridicule her in the eyes of patients and drug representatives. We have previously recognized that there is a difference between "generalized" statements that pollute the work environment and "personal gender-based remarks" that single out individuals for ridicule. *See Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 197 (4th Cir. 2000). Common experience teaches that the latter have a greater impact on their listeners and thus are more severe forms of harassment.

In this case, many of Kessel's comments ventured into highly personal territory. While Waechter was pregnant, he frequently commented about the size of her breasts. After she gave birth, he asked to see her breasts and to pump them, stated that he wanted to lick up her breast milk, inquired about the status of her libido, and opined that she was probably a "wild thing" in bed. The impact of these comments may have been aggravated by the fact that Kessel had previously made comments to Waechter about his genitals and those of his wife. When assessing the severity of Kessel's conduct, a jury could give significant weight to the intensely personal nature of this interaction.

The fact that this interaction took place at a medical clinic need not negate its severity, as Fairbrook contends. It is true that employees at Fairbrook had clinical duties which are not part of other professions, and it is likewise accurate that some employees, including Waechter, occasionally made off-color remarks. But a plaintiff's claim is not defeated solely because she engages in some crude behavior. *See Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987) ("Plaintiff's use of foul language or sexual innuendo in a consensual setting does not waive her legal protections against unwelcome harassment.") (internal quotation omitted). As Fairbrook acknowledges, most of the jokes at the clinic were told in fun, and there is no evidence that employees or patients routinely subjected each other to the sort of intensely personal and demeaning remarks that Kessel allegedly directed at Waechter. A jury could thus find that a reasonable person in Waechter's position might tolerate run-of-the-mill jokes and even make some herself while still finding Kessel's unique brand of invective to be hostile or abusive.

Moreover, we decline to accept the argument that a medical setting, because it deals with human anatomy, is somehow liberated from professional norms. This argument is essentially an effort to exempt medical settings from the requirements of Title VII, notwithstanding the fact that Congress did not do so. To be sure, no one wishes every workplace to wear a grim face, and there must of course be room for humor to alleviate the tensions that inhere in the course of patient care. Here, however, Dr. Kessel's remarks could be found by a jury to heighten tensions, to adversely affect the performance of female professionals, and to communicate a dismissive attitude to female physicians that hardly seems consonant with the highest standards of professional treatment.

Furthermore, a jury might conclude that the environment at the clinic actually enhanced the severity of the harassment rather than negating it. When evaluating the context in which harassment takes place, we have often focused on the "dispar-

ity in power between the harasser and the victim." *Ziskie*, 547 F.3d at 227. In *E.E.O.C. v. R&R Ventures*, 244 F.3d 334 (4th Cir. 2001), for example, we reasoned that the objective severity of the harassment was compounded by the fact the harasser was "an adult male in a supervisory position over young women barely half his age." *Id.* at 340. Here, a jury could likewise conclude that severity of Kessel's conduct was exacerbated by the fact that he was not only Waechter's immediate supervisor but also the sole owner of Fairbrook. Unlike one of Waechter's fellow employees, Kessel had significant authority over her on a day-to-day basis and the ability to influence the rest of her career.

## C.

Fairbrook raises several additional arguments about why Kessel's conduct was not sufficiently severe or pervasive. First, it contends that Kessel's conduct was not particularly frequent. We think, however, that a jury could find that the harassment was at least a regular occurrence. Waechter identified a number of specific incidents that occurred over a three year period, estimated that she heard Kessel tell foul jokes two or three times each month, and recalled him displaying an image of his penis twenty-five to thirty times and referring to it as "Mr. Happy" on five to ten of these occasions. More importantly, Waechter testified that the frequency of Kessel's conduct escalated after she returned from maternity leave. By her estimation, he made comments about her breasts at least once or twice a week from December of 2005 through January of 2006. By that point, a reasonable person in her position may well have concluded that the harassment had become a persistent feature of her work environment. Thus, this is simply not a case involving only a handful of isolated and thus non-actionable incidents. *See Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (noting that the plaintiff identified only four gender-based comments).

Second, Fairbook argues that Kessel's conduct was not sufficiently severe because it did not cause Waechter to miss

work due to stress or otherwise adversely affect her job performance. These factors, while relevant, are not decisive here. "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris*, 510 U.S. at 22. The fact that a plaintiff continued to work under difficult conditions is to her credit, not the harasser's. Moreover, the fact that Waechter continued to provide quality care to her patients in spite of Kessel's conduct is not dispositive either. The critical inquiry "'is not whether work has been impaired, but whether working conditions have been discriminatorily altered.'" *R&R Ventures*, 244 F.3d at 340 (quoting *Harris*, 510 U.S. at 25 (Scalia, J., concurring)). Here, a jury could conclude that Kessel altered Waechter's working conditions by, among other things, bombarding her with graphic and highly personalized comments about intimate features of his and her anatomy. That Waechter may have stuck it out until a new job became available does not, without more, defeat the EEOC's claim.

Third, Fairbrook contends that there is no evidence of any inappropriate touching, physical threats, sexual advances, or propositions that would tend to make Kessel's conduct severe or pervasive. This is not entirely correct. While there is no indication that Kessel touched Waechter inappropriately or threatened her with force, there is evidence that he, at least implicitly, proposed that they engage in sexual activity. In February of 2006, for example, Kessel said that Waechter owed him "big" for his help in the Frye matter and asked if she would let him pump her breasts. A reasonable jury could conclude that he was suggesting that they engage in sexual activity, especially given that he had previously inquired about the status of her libido and had opined that she was probably a "wild thing" in bed. But even if a jury concluded that such comments were merely intended to humiliate Waechter on the basis of gender, it could nonetheless find that her environment was hostile. "A work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual

advances." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000).

Lastly, Fairbrook attacks Waechter's account of events on several fronts. Among other things, it argues that some aspects of her story have not been sufficiently corroborated, and it suggests that she filed a discrimination charge merely to coerce Kessel into contributing toward the debt she owed to Frye Regional Medical Center. In our view, however, these matters go to Waechter's credibility and are thus best resolved at trial, rather than at the summary judgment stage.

For the reasons above, we conclude that the EEOC has produced evidence from which a reasonable jury could conclude that Kessel's conduct was severe or pervasive enough to create a hostile work environment. This evidence, if proven at trial, indicates that Kessel, who was both Waechter's supervisor and the sole owner of the establishment, crossed the line from general crudity into actionable harassment by subjecting Waechter to a series of sexually graphic and unmistakably personal remarks that made her work environment intensely uncomfortable.

## D.

Finally, we turn to the question of whether Kessel's conduct is imputable to Fairbrook. The parties dispute whether Fairbrook may raise the affirmative defense set out in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), in light of the fact that Kessel was not only Waechter's supervisor but also the sole owner of the practice. We need not resolve that question at this time, however. Even assuming that the affirmative defense applies, the EEOC has, at a minimum, raised a material question of fact as to whether Fairbrook "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher*, 524 U.S. at 807. Fairbrook never conducted any investigation or

took any corrective action to address the sexual harassment, despite the fact that Waechter complained to Kessel on multiple occasions, to office manager Shelia Cook on one occasion, and perhaps even to personnel manager Sherry Bartnicki as well. Given this total lack of response, a jury could conclude that Fairbrook failed to exercise reasonable care and was thus liable for Kessel's actions.

## III.

For the reasons above, we conclude that the EEOC has raised a triable issue with respect to each element of its hostile work environment claim. Accordingly, we reverse the district court's grant of summary judgment and remand for trial.

*REVERSED AND REMANDED*