**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1135**

GERALDINE LAUTURE,

                Plaintiff - Appellant,

        v.

SAINT AGNES HOSPITAL; ST. AGNES HOSPITAL,

                Defendants - Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Catherine C. Blake, District Judge.
(1:08-cv-00943-CCB)

Argued:  December 9, 2010                 Decided:  May 18, 2011

Before Sandra Day O'CONNOR, Associate Justice (Retired), Supreme
Court of the United States, sitting by designation, and KING and
DAVIS, Circuit Judges.

Affirmed by unpublished opinion.   Justice O'Connor wrote the
opinion, in which Judge King and Judge Davis joined.

Fatai A. Suleman, AMITY, KUM & SULEMAN, PA, Greenbelt, Maryland,
for Appellant.  Robert Ross Niccolini, OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, PC, Washington, D.C., for Appellees.

Unpublished opinions are not binding precedent in this circuit.

O'CONNOR, Associate Justice:

Geraldine Lauture appeals the district court's grant of summary judgment to her employer, St. Agnes Hospital, on her race- and national origin-based claims for discrimination, hostile work environment, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. She also appeals the district court's grant of summary judgment to St. Agnes on her state law claims for breach of contract and intentional infliction of emotional distress. For the reasons set forth below, we affirm.


I

Appellant Geraldine Lauture, who is black and was born in Haiti of Haitian parents, was employed by St. Agnes Hospital as a Medical Laboratory Technician. Lauture holds an associate degree in Medical Laboratory Technology and a Certificate of Achievement for completing training in chemistry, hematology, and microbiology. From July 2004 until December 2005, Lauture worked the evening shift in the Microbiology Lab without any direct supervision. In December 2005, Lauture was allowed to switch to the day shift so that she could spend time with her children. On the day shift, Lauture was supervised by Jane Weiger and Margaret Kinch, the Microbiology Lab's co-Lead

2

Technologists, who had permitted Lauture's move from the evening shift. Weiger and Kinch are both white and U.S.-born.

While working the day shift, Lauture began experiencing interpersonal problems with Stephanie Rutter, a white, U.S.-born Lab Assistant. On or about January 4, 2006, Kinch and Weiger gave Lauture and Rutter documented verbal warnings that their "inability to get along and work together" was interrupting the work of others in the lab and had impacted patient care. J.A. 84. The warning further stated that the women were "dragging other co-workers into their Mexican stand-off" and violating St. Agnes' Code of Conduct by "not treating co-workers with respect." Id.

Lauture was also disciplined for performance problems stemming from her work on the day shift. On February 2, 2006, Lauture received a documented verbal warning explaining eight clinical errors she made between January 2 and January 23. The counseling report stated that the incidents "indicat[e] lack of basic [c]linical skills and knowledge needed to perform her job." J.A. 336. The report mandated that Lauture be retrained by an "experienced technologist" from February 16 to March 3. Lauture signed the report, but wrote above her signature, "I do not agree with everything that was said on these comments." Id. In her deposition, Lauture did not recall or denied most of the

3

errors and thought that she handled others appropriately by going to her supervisors with the problem. Supp. J.A. 22–35.

On or about February 7, 2006,[1] Lauture was suspended for three days for additional performance issues, documented in another counseling report. J.A. 344–47. The report stated that the incidents "show a fundamental lack of knowledge and the resolutions to correcting these issues cannot be imparted by additional training." J.A. 345. Among the listed errors was Lauture's failure to properly heat a water bath. The report alleged that the water bath error had resulted in a delay in testing a specimen that caused many individuals to be exposed to meningitis. J.A. 345–46. Weiger and Kinch signed the report, but St. Agnes maintains that Aimee Ringgold, a black female who is an Employee Relations Consultant at St. Agnes, made the suspension decision. J.A. 134. Lauture wrote "Refusal to Sign" on the report instead of her signature. J.A. 344.

Roughly two weeks later, Kinch and Weiger filed an amendment to the February 7 report, explaining that the test

---

[1] The date on the counseling report and next to the signatures of Kinch and Weiger is February 7, 2006, but Lauture's "refusal to sign" is dated February 8, 2006. J.A. 344. Lauture's brief to this Court states that she was suspended on February 8. Appellant's Br. at 7. We refer to the date of suspension as February 7, 2006, merely for the ease of identifying the counseling report that instituted the suspension. The precise date and exact order of events does not influence our assessment of this case.

4

that had been delayed was a cryptococcal antigen test, not a meningitis test. They therefore "apologize[d] for implying that Geraldine was involved with the safety issue of notifying the persons" potentially exposed to meningitis. J.A. 349. They did not, however, alter Lauture's suspension because "the issue still remains that she did not perform proper corrective action for the maintenance of the [] water bath," which "caused a delay in patient testing." Id.

On February 8, 2006, Lauture met with St. Agnes' Diversity Manager, Sherry Buebendorf, a black woman, to complain about the warning she had received and about her issues with Stephanie Rutter. Lauture complained that she was being treated unfairly. Buebendorf's report on the meeting reflects that she and Aimee Ringgold spoke to Kinch and Weiger, Lauture's supervisors, and concludes that, "After speaking with Ms. Lauture, reviewing documentation in Ms. Lauture's employee file and interviewing Peg Kinch and Jane Weiger, I am unable to state that there were any instances of discrimination against Ms. Lauture." J.A. 342. Lauture asserts that she never heard anything further about her complaint. J.A. 239.

On February 17, 2006, Lauture submitted a letter to St. Agnes Hospital, copying Kinch, Weiger, the Director of Human Resources, and others. The letter addressed the warnings she had received and explained why she viewed the underlying

5

assertions by her supervisors as false.  She also stated, "I have been discriminated against and my human rights have been seriously violated."  J.A. 355.  Lauture alleges that St. Agnes did not respond to her letter or investigate its contents.  J.A. 239.

Following her suspension, Lauture completed the two weeks of retraining that the February 7 counseling report required.  A March 9, 2006, report by Mainaki Parikh, the technician who retrained Lauture, explains that Lauture "knows her duties well" and "is trying to improve."  J.A. 357.  But it also states that Lauture "is extremely slow," "cannot perform a couple of tasks at the same time," "has a hard time understanding when a doctor calls for results," "did not ask . . . very many questions during her training," and "has potential to perform her duties adequately, if she could take them responsibly and seriously." J.A. 357.

On March 9, 2006, apparently in response to a complaint by Stephanie Rutter that Lauture was ignoring her, St. Agnes' Human Resources staff convened a meeting that was attended by Lauture, Rutter, Finch, Weiger, Ringgold, Lab Director Jo Oliver, and Colleen Meegan, another Human Resources employee.  Lauture felt intimidated and cried during the meeting.  J.A. 239; Supp. J.A. 53.  All of the other attendees are white and/or U.S.-born. J.A. 239.

The next day Lauture submitted her resignation letter to St. Agnes, giving two-week notice. Lauture explained in the letter that her work situation was causing "insomnia, anxiety and overwhelming stress." J.A. 371. She stated that St. Agnes had failed to address the "prejudice, discrimination and blatant lies" to which she had been subjected and that, "[i]t is unfortunate that this hospital . . . allows certain of its employees to show a lack of ["brotherly love"] to myself, another employee of a different skin color who comes from a different place of birth." Id.

St. Agnes made Lauture's resignation effective immediately, and security guards then escorted her out of the building.

On April 7, 2006, Lauture filed a Charge of Discrimination against St. Agnes with the Baltimore Community Relations Commission. On February 5, 2008, the U.S. Equal Employment Opportunity Commission issued Lauture a Notice of Right to Sue, and Lauture filed suit against St. Agnes in the U.S. District Court for the District of Maryland on April 15, 2008.

In the district court, Lauture's initial complaint asserted claims of discrimination, specifically disparate discipline, hostile work environment, and constructive discharge under Title VII. After discovery, St. Agnes moved for summary judgment. The district court granted Lauture's motion for leave to file an amended complaint adding state law claims for breach of contract

7

and intentional infliction of emotional distress, and granted St. Agnes' motion for summary judgment on all claims. Lauture v. St. Agnes Hosp., No. CCB-08-943, 2009 WL 5166253, at *1 (D. Md. Dec. 29, 2009). Lauture appeals.

II

We review the district court's summary judgment decision de novo, "'view[ing] the facts and draw[ing] reasonable inferences in the light most favorable' to the nonmoving party," here Lauture. EEOC v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 322 (4th Cir. 2010) (quoting Scott v. Harris, 550 U.S. 372, 378 (2007)). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986).

Lauture's claim of race and national origin discrimination rests on her contention that she was disciplined more severely than Caucasian, U.S.-born employees who made laboratory errors of similar severity. To establish a prima facie case of race or national origin discrimination in the context of a disparate discipline claim, a plaintiff must demonstrate: "(1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees." Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993) (citing Moore v. City of Charlotte, N.C., 754 F.2d 1100, 1105–06 (4th Cir. 1985), which adapted the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Title VII burden-shifting framework to a disparate discipline case). If a plaintiff succeeds in making out a prima facie case, then the burden shifts to the employer, which must articulate a non-discriminatory reason for the difference in discipline. If the employer "articulate[s] such a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the employer's reasons are not true but instead serve as a pretext for discrimination." Id. The "ultimate burden of proving that

the employer intentionally discriminated," however, remains with the plaintiff. Id. (citing Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981)).

The district court recognized, and the parties do not dispute, that Lauture is a member of a protected class. But the district court held that Lauture could not establish a prima facie case of discrimination because "even if she could show that employees outside her protected classes engaged in misconduct of comparable seriousness, she cannot demonstrate that they were disciplined less severely than she was." Lauture, 2009 WL 5166253, at *5. The district court examined the discipline records of eight individuals that Lauture put forward as comparators. It concluded that three—Rutter, Finch, and Weiger—were not appropriate comparators because they held different positions than Lauture. Id. The district court therefore considered the remaining five individuals: Deborah Sanchez, Therese Dalrymple, Christina Graves, Sally Turner, and Jackie Wilson—all of whom are white and/or U.S.-born. See J.A. 631 (List of microbiology associates, July 21, 2004 through Mar. 10, 2006). The district court held that even if, as Lauture alleges, all five committed lab errors of equivalent seriousness to Lauture's, Lauture's documented verbal warning, retraining, and three-day suspension "place her squarely within the range of discipline imposed by the defendant on Medical Technicians

10

committing laboratory errors," especially given that at least two St. Agnes employees outside of Lauture's protected class were terminated for laboratory errors. Id. at *6.[2]

Lauture alleges that the retraining and suspension she received for laboratory errors are outside the range of discipline imposed on comparators outside her protected class. Specifically, she argues that the district court erred in considering the termination of two comparators who were terminated in 2007, after Lauture filed her complaint in this case. Appellant's Br. at 19–20. Lauture argues that "the relevant end-time period should be at the time [she] left St. Agnes," that is, March 2006. Appellant's Reply Br. at 5.

We note that, save one minor exception not involving a laboratory error, all of the evidence that Lauture has put forth to show the allegedly more lenient discipline of her comparators arises from incidents that occurred after Lauture left St. Agnes. J.A. 213–15. Thus Lauture's proposed end date for the discipline of comparators would eliminate not just the evidence of the terminations that she seeks to exclude, but all of the evidence as to the treatment of her comparators. In essence, her proposed rule would bar her comparator evidence, and her

---

[2] These facts are verified by exhibits filed with the Court under seal to protect the privacy of third parties.

11

claim would fail on that basis. We decline her invitation to establish a fixed evidentiary end date.

Although comparators must be similarly situated, we have recognized that "the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." Cook, 988 F.2d at 511. We therefore consider whether the comparator discipline evidence in the record, taken as a whole, is sufficient for Lauture to show that she was more severely disciplined than comparably situated employees outside her class who made laboratory errors. We conclude that she has not made that showing. Even if Lauture is correct that some of the Caucasian, U.S.-born medical technicians were treated more favorably and not suspended or retrained for committing laboratory errors, the termination of two Caucasian, U.S.-born lab technicians was more severe than the suspension and retraining imposed on Lauture. Thus, Lauture's discipline was within the "range of discipline" that St. Agnes typically imposed for laboratory errors, and "there was no disparity of treatment from which one could conclude that [Lauture's] discipline was the product of racial [or national-origin] animus." Id. at 512.

Because we hold that Lauture did not proffer a prima facie case of disparate discipline, we need not reach the district

12

court's alternative holding that Lauture failed to demonstrate that St. Agnes' stated reason for the discipline—Lauture's poor job performance—was pretextual. Lauture, 2009 WL 5166253, at *6–*7.

B

Lauture bases her hostile work environment claim on the following assertions: (1) she was disciplined more harshly than similarly situated employees outside her protected classes; (2) St. Agnes failed to investigate her discrimination complaints; (3) St. Agnes responded with more attention to complaints of employees outside her protected classes; (4) St. Agnes falsely accused her of causing a meningitis exposure; (5) a report used the phrase "Mexican stand-off" in reference to her disputes with Stephanie Rutter; and (6) a report stated that she was untrainable. Appellant's Br. at 27.

To demonstrate a race- or national origin-based hostile work environment, Lauture must show that a reasonable jury could find she was the subject of conduct that was: (1) unwelcome, (2) based on race or national origin, and (3) "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," and that (4) there is some basis for imposing liability on the employer. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-84 (4th Cir. 2001). "Establishing the third element requires that the plaintiff show that the work

13

environment was not only subjectively hostile, but also objectively so." Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir. 2011). That is, a plaintiff must demonstrate that she subjectively perceived the environment to be hostile and that "the conduct was such that a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008) (internal citation omitted). To determine whether the conduct at issue was objectively severe, we must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris v. Forklift Sys., 510 U.S. 17, 23 (1993)). The plaintiff may offer either direct evidence of discrimination or evidence that she was treated differently than similarly situated employees outside of her protected classes. Gilliam v. South Carolina Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007).

The district court correctly held that Lauture has shown neither that the alleged discrimination was based on her race or national origin, nor that the conduct was sufficiently severe or pervasive to be abusive. Lauture offers no direct evidence of

14

discrimination.[3]  For the reasons explained above, she has not shown that she was disciplined more severely than her white, U.S.-born coworkers.  Further, uncontroverted evidence in the record shows that contrary to Lauture's allegation, St. Agnes did investigate the complaints Lauture made in her February 8, 2006, meeting with Diversity Manager Sherry Buebendorf.  J.A. 341–42. The fact that Lauture was unaware of the investigation is immaterial.  Although St. Agnes' actions, including the erroneous meningitis accusation, and perceived better treatment of others clearly upset Lauture, the alleged actions are not "sufficiently severe and pervasive to create an objectively abusive atmosphere."  Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 191 (4th Cir. 2004) (internal quotation marks omitted); cf. Sunbelt Rentals, 521 F.3d at 316–18 (reversing summary judgment to defendant employer where employees, inter alia, repeatedly called Muslim plaintiff derogatory names, mocked his attendance at prayer sessions, and defaced his business cards).

---

[3] The district court correctly noted that the use of the phrase "Mexican stand-off" is not direct evidence of discrimination given the common definition of the term, however unfortunate and inappropriate it may be as a choice of words. Lauture, 2009 WL 5166253, at *8 n.8 (quoting Webster's Third New International Dictionary 1425 (Philip Babcock Gove et al., eds., 1986), defining "Mexican standoff" as a "draw" or "deadlock").

15

Lauture relies on the same factual allegations to support her constructive discharge claim as she does to support her hostile work environment claim. The immediate catalyst for her resignation was the March 9, 2006 meeting, during which she felt intimidated and cried.

In this circuit, an employee alleging constructive discharge must "allege and prove two elements: (1) the deliberateness of [the employer's] actions, motivated by racial [or national origin] bias, and (2) the objective intolerability of the working conditions." Honor, 383 F.3d at 187. "To prove deliberateness, the plaintiff must prove 'that the actions complained of were intended by the employer as an effort to force the employee to quit.'" Whitten v. Fred's, Inc., 601 F.3d 231, 248 (4th Cir. 2010) (quoting Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1354 (4th Cir. 1995)).[4] This court has

---

[4] In dicta in Whitten, we noted that this circuit's deliberateness requirement is "arguably in some tension with the Supreme Court's decision in Pennsylvania State Police v. Suders, 542 U.S. 129 (2004)." Whitten, 601 F.3d at 248 n.8. Lauture argues on that basis that we should no longer require constructive discharge plaintiffs in hostile work environment situations to prove that the employer intended to force the employee to quit. As we noted in Whitten, circuit precedent requires the employer intent showing, and one panel of the court cannot overrule a prior panel. Id. at 249 n.8. We therefore decline Lauture's invitation to do away with the intent requirement.

insisted that constructive discharge claims be "carefully cabined" because the claim is "so open to abuse." Honor, 383 F.3d at 187. Our prior cases have explained that "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Id. (quoting Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004)).

Lauture has shown neither the intolerability of her working conditions nor deliberateness by St. Agnes intended to force her to quit. Lauture's complaints center on her perception that she was unfairly criticized for her performance and the personal problems she and Rutter experienced and that her complaints were not investigated, especially in comparison to those of other employees. Although these circumstances were unpleasant for Lauture, they are akin to the "feeling of being unfairly criticized" and "unpleasant working conditions" that we held insufficient for a constructive discharge claim in Williams v. Giant Food Inc., 370 F.3d at 434 (finding working conditions not intolerable where supervisors yelled at the employee, told her she was a poor manager, gave her poor performance evaluations, chastised her in front of customers, and once required her to work with an injury). Taken as a whole Lauture's allegations do not rise to the level of intolerability. In addition, Lauture

17

has adduced no evidence that St. Agnes' actions were deliberately intended to force her to quit or that the actions were motivated by race or national origin bias. Honor, 383 F.3d at 186–87.

We therefore affirm the district court's grant of summary judgment to St. Agnes on this claim.

D

In addition to her federal Title VII claims, the district court allowed Lauture to amend her complaint to add Maryland state law claims for breach of contract and intentional infliction of emotional distress (IIED).

Lauture alleges that St. Agnes is liable for breach of contract for violating its Associate Handbook by suspending her and terminating her immediately upon receipt of her resignation letter. The district court held that the handbook was not a contract and granted summary judgment to St. Agnes. We agree.

The parties do not dispute that under Maryland law, an employee handbook can give rise to a breach of contract claim but that an employer can nonetheless disclaim contractual liability in the handbook. See Mayers v. Washington Adventist Hosp., 131 F. Supp. 2d 743, 751 (D. Md. 2001) (citing Bagwell v. Peninsula Reg. Med. Ctr., 665 A.2d 297, 309 (Md. Ct. Spec. App. 1995)). They merely disagree over the clarity of the disclaimer in St. Agnes' handbook. Lauture does not specify whether she

18

relies on the 2004 or 2005 handbook, but the difference between the two is minimal.  The 2005 version of the handbook states, in relevant part,

> Neither the Handbook nor the personnel policies manual are intended to set forth either express or implied contractual obligations of St. Agnes.  Any implication to the contrary is expressly disclaimed.  St. Agnes retains all rights to change the provisions and contents of this Handbook, including personnel policies, procedures, benefits, or any other conditions of employment at any time as circumstances warrant.  J.A. 668.

Lauture asserts that the disclaimer is ambiguous.  Appellant's Br. at 36.  We disagree. The express disclaimer of contractual liability is sufficiently clear to render the Handbook not a contract and thus not susceptible to breach.  Cf. Mayers, 131 F. Supp. 2d at 751.  Because the Handbook is not a contract, Lauture's further contention that it is a contract of adhesion that should be construed against St. Agnes is also unavailing.

Lauture's second state law claim was for IIED.  She bases this claim on St. Agnes' decision to make her resignation effective immediately and the fact that she was escorted from the building by security guards.  Under Maryland law, "[a] claim of IIED has four elements: '(1) The conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; (4) [t]he emotional distress must be severe.'"  Manikhi v. Mass Transit Admin., 758 A.2d 95,

19

113 (Md. 2000) (alterations in original) (quoting Harris v. Jones, 380 A.2d 611, 614 (Md. 1977)). All four of these elements must be pleaded and proven with specificity. Id.

Lauture has failed to show that St. Agnes' conduct was "extreme and outrageous." Immediately accepting Lauture's resignation and having her escorted out of the building by security guards simply does not constitute conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" as the Maryland courts have required. Harris, 380 A.2d at 614 (quoting Restatement (Second) of Torts §46, comment d (1965)). St. Agnes' conduct is unlike that which the Maryland courts have found to be extreme and outrageous. See, e.g., Batson v. Shiflett, 602 A.2d 1191, 1216 (Md. 1992) (listing cases of outrageous and extreme conduct, including, for example, a psychologist who had sexual relations with the plaintiff's wife while acting as the couple's marriage counselor). It instead falls within the "mere insults, indignities, . . . annoyances, [and] petty oppressions" to which Maryland courts have not extended IIED liability. Id. (quoting Restatement (Second) of Torts §46, comment d (1965)).

In addition, Lauture has not shown that she suffered severe emotional distress. Although we must consider the "personality

20

of the individual to whom the misconduct is directed," Batson, 602 A.2d at 1216, the burden of showing emotional distress to be severe is a high one, Manikhi, 758 A.2d at 114. Lauture's amended complaint makes only the conclusory claim she has suffered severe and extreme emotional distress. Her brief adds that she has taken acupuncture treatments. The Maryland courts have described the requisite level of distress as that "of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." Harris, 380 A.2d at 617 (quoting Fletcher v. Western Nat'l Life Ins. Co., 89 Cal. Rptr. 78, 90 (Cal. Ct. App. 1970)). Lauture's allegations are "unaccompanied by any evidentiary particulars," id., and insufficient to surmount the high burden for IIED claims.

## III

For the foregoing reasons, we affirm the district court's grant of summary judgment to St. Agnes Hospital on all claims.

AFFIRMED

21